## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSSTYN RICHTER, derivatively on behalf of SCWORX CORP., | |
| Plaintiff, | Case No.: |
| vs. | |
| MARC S. SCHESSEL, CHARLES K. MILLER, ROBERT CHRISTIE, and STEVEN WALLITT, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SCWORX CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Josstyn Richter ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant SCWorx Corp. ("SCWorx" or the "Company"), files this Verified Shareholder Derivative Complaint against Marc S. Schessel, Charles K. Miller, Robert Christie, and Steven Wallitt (collectively, the "Individual Defendants," and together with SCWorx, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of SCWorx, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SCWorx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by SCWorx's directors and officers from April 13, 2020 through the present (the "Relevant Period").

2.      SCWorx is a New York-based software company that offers data services and software solutions to various healthcare providers. The Company's software is aimed at optimizing information flow and enhancing the business systems of healthcare organizations.

3.      Since the beginning of 2020, the world has been ravaged by one of the most serious public health crises in recent memory—the COVID-19 pandemic. As of the filing of this complaint, over 22 million cases of the virus have been reported across the planet, with the death toll nearing 800,000.[1] The pandemic has also placed immense strain on healthcare providers in the U.S. and worldwide, resulting in serious shortages of much-needed medical equipment, such as antibody test kits that can be used to screen patients for the virus.

4.      In the midst of such shortages, on April 13, 2020, the Individual Defendants announced to the public that the Company had received a purchase order from Rethink My Healthcare Inc. ("Rethink My Healthcare"), a U.S.-based telemedicine health network, for 2

---

[1] https://coronavirus.jhu.edu/ (last visited August 20, 2020).

million antibody test kits priced at $17.50 per unit, termed "COVID-19 Rapid Testing Units" by the Company, which would be delivered to hospitals and other healthcare providers in the U.S. (the "Purchase Order"). The Purchase Order also provided for subsequent orders of 2 million testing units per week for the next 23 weeks, valued at $35 million per week, for a total of 48 million testing units. The Individual Defendants later disclosed that in order to fulfill the Purchase Order, the Company would buy an aggregate of 52 million testing units at $13.00 per unit from ProMedical Equipment Pty Ltd. ("ProMedical"), an Australian medical equipment manufacturer. The sheer volume of testing units that the Individual Defendants alleged would be delivered was such that the Purchase Order would likely have an appreciable impact on the U.S.'s overall COVID-19 testing capacity.

5. Upon the Company's April 13, 2020 announcement, the Company's stock more than quintupled in value, soaring from $2.25 per share at the close of trading on April 9, 2020, the prior trading day, to $12.02 per share at the close of trading on April 13, 2020. However, these astonishing gains would ultimately be short-lived.

6. The next day, on April 14, 2020, Utopia Capital Research, a short seller firm, published a report calling into question the Individual Defendants' credibility, and labeling the claims in the Company's announcement the prior day "very difficult to believe."[2]

7. On this news, the Company's stock lost nearly 30% of its value, sinking from $12.02 per share at the close of trading on April 13, 2020, to $8.45 per share at the close of trading on April 14, 2020.

8. On April 17, 2020, Hindenburg Research, a forensic financial research firm, published a report detailing an in-depth investigation into the Company's purported Purchase

---

[2] https://utopiacap.com/2020/04/14/worx/ (last visited August 20, 2020).

Order (the "Hindenburg Report").[3] The Hindenburg Report set forth a comprehensive list of troubling discoveries and observations Hindenburg Research had made during its investigation of the various actors involved in the Purchase Order, including: (1) the strangeness of the notion that a healthcare software company such as SCWorx would suddenly enter into a relatively gargantuan arrangement to purchase and deliver medical equipment, not software; (2) past fraudulent acts committed by the Company's Chief Executive Officer ("CEO"), Defendant Marc S. Schessel ("Schessel"), including paying a judgment for submitting fraudulent expense reports; (3) an extensive history of fraudulent misrepresentations on the part of ProMedical, including ProMedical falsely purporting to have an arrangement with Wondfo, a Chinese manufacturer, to sell and market Wondfo testing kits; and (4) the fact that Rethink My Healthcare was in reality a tiny company with only a handful of employees, and would scarcely be able to handle weekly orders of millions of dollars' worth of testing kits.

9.     The Hindenburg Report concluded that the Purchase Order was "completely bogus," and further asserted that trading of the Company's stock could be suspended once regulators begin to look into the Company's "potentially nefarious business practices."

10.     On this news, the price of the Company's stock sunk by over 17%, falling over the next three trading days from $6.96 per share at the close of trading on April 16, 2020, to $5.76 per share at the close of trading on April 21, 2020.

11.     A number of subsequent events further illustrate the extent and the seriousness of the Individual Defendants' misrepresentations.

---

[3] https://hindenburgresearch.com/scworx-evidence-points-to-its-massive-covid-19-test-deal-being-completely-bogus-price-target-back-to-2-25-or-lower/ (last visited August 20, 2020).

12.     First, on April 21, 2020, true to Hindenburg Research's prediction, the SEC issued an order halting all trading in SCWorx stock, which took effect the next day. The SEC's suspension order stated that the suspension was implemented due to "a lack of current and accurate information concerning the securities of SCWorx."

13.     Next, on April 30, 2020, the Company revealed that due to "substantial concerns" having arisen regarding ProMedical, Rethink My Healthcare and the Company had terminated their respective arrangements relating to the Purchase Order, and the Company had instead entered into an arrangement with an alternative supplier to purchase only 500,000 testing units. The Company also disclosed that Defendant Christie had resigned from the Company's Board.

14.     Not long after, on May 5, 2020, the Company disclosed that its Chief Operating Officer, non-party James Schweikert, had stepped down from his position with the Company. That same day, NASDAQ Capital Market ("NASDAQ") officials requested additional information and documents from the Company in connection with the trading halt, and informed the Company that the halt would remain in place until the Company has satisfied NASDAQ's information request.

15.     Finally, on June 12, 2020, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K,") which revealed that in April 2020, the Company had received a request from the U.S. Attorney's Office for the District of New Jersey for information and documents pertaining to the Company's false and misleading April 13, 2020 press release.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the

Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's buyer, Rethink My Healthcare, was a relatively tiny company that would almost certainly be unable to pay for or handle the hundreds of millions of dollars in testing kit orders provided for in the Purchase Order; (2) the Company's supplier, ProMedical, had a history rife with fraudulent misrepresentations, and would likewise almost certainly be unable to meet its obligations pursuant to the Purchase Order; (3) due to the foregoing, the provisions of the Purchase Order were either grossly overblown or the Purchase Order itself was completely falsified; and (4) the Company failed to maintain internal controls. As a result of the foregoing, SCWorx's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

19.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and the Company's CEO to three federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the CEO's liability in the Securities Class Actions and the current directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

22.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of SCWorx. Plaintiff has continuously held SCWorx common stock since the beginning of the Relevant Period.

### Nominal Defendant SCWorx

27.     SCWorx is a Delaware corporation with its principal executive offices located at 590 Madison Avenue, 21st Floor, New York, New York 10022. SCWorx's shares trade on the NASDAQ under the ticker symbol "WORX."

### Defendant Schessel

28.     Defendant Schessel is the Company's founder, and has served as the Company's Chairman and CEO since 2012. According to the 2019 10-K, as of June 3, 2020, Defendant Schessel beneficially owned 1,197,106 shares of the Company's stock, including options and warrants, which represented 12.5% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $5.75, Defendant Schessel owned approximately $6.88 million worth of SCWorx stock.

29.     For the fiscal year ended December 31, 2019, Defendant Schessel received $880,945 in compensation from the Company. This included $366,667 in salary, $486,750 in stock awards, and $27,528 in all other compensation.

30.     The 2019 10-K stated the following about Defendant Schessel:

Mr. Schessel, 57, is SCWorx's founder and Chairman and Chief Executive Officer. He founded SCWorx's predecessor (Primrose LLC) in 2012 and has been Chairman and CEO of SCWorx since then. Commencing his work in supply chain during his ten years in the Marine Corps, Mr. Schessel was awarded the Naval Achievement medal along with the Naval Commendation medal for services rendered in creating the first automated supply and logistics software (M triple S) which was ultimately put in service at leading corporations such as Sears and IBM. Since leaving the Marine Corps, Mr. Schessel has continued his work in refining programmatic solutions for the most complex and critical supply chains in the country — the

healthcare industry. Working in all facets of the Healthcare Supply Chain, Mr. Schessel spent over ten years as a Vice President of Supply Chain for a large NYC based Integrated Delivery Network before forming his own consultancy — focused on delivering automated solutions to Providers, Business-to-Business (B2B) e-commerce companies (GHX), tier one consulting firms, GPOs, distributors, payors and manufacturers. Mr. Schessel also served as a consultant to the United Nations — developing an automated Emergency Medical Response program that, based on the event, forecasts the items, quantities and logistical delivery networks crucial for responders, allowing countries by region to better plan, stock and store critical supplies.

**Defendant Miller**

31.     Defendant Charles K. Miller ("Miller") has served as a Company director since October 24, 2018. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. According to the 2019 10-K, as of June 3, 2020, Defendant Miller beneficially owned 82,516 shares of Company stock, including options and warrants. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $5.75, Defendant Miller owned approximately $474,467 worth of SCWorx stock.

32.     For the fiscal year ended December 31, 2019, Defendant Miller received $203,108 in compensation from the Company, which consisted entirely of option awards.

33.     The 2019 10-K stated the following about Defendant Miller:

Mr. Miller, 59, joined our board on October 24, 2018. He has been a member of the board of directors of InterCloud Systems, Inc., a publicly traded IT infrastructure services company, since November 2012. In addition, he has, since June 2017, acted as an independent business consultant. He was the Chief Financial Officer of Tekmark Global Solutions, LLC, a provider of information technology, communications and consulting services, from September 1997 until June 2017. Since May 2017, he has been a director of Notis Global, Inc., a diversified holding company, in the industrial hemp industry, that manufactures, markets and sells hemp derivative products such as cannabidiol ("CBD") distillate and isolate. Mr. Miller graduated from Rider University with a Bachelor of Science in Accounting and an MBA. Mr. Miller is a Certified Public Accountant and boasts more than three decades of experience.

**Defendant Christie**

34.     Defendant Robert Christie ("Christie") served as a Company director from February 1, 2019 until he resigned on April 23, 2020. According to the 2019 10-K, as of June 3, 2020, Defendant Christie beneficially owned 25,893 shares of Company stock, including options and warrants. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $5.75, Defendant Christie owned approximately $148,884 worth of SCWorx stock.

35.     For the fiscal year ended December 31, 2019, Defendant Christie received $203,108 in compensation from the Company, which consisted entirely of option awards.

36.     The Company's Schedule 14A filed with the SEC on December 3, 2019 stated the following about Defendant Christie:

> Mr. Christie, 65, from 2004 through 2014, was the President and CEO of The 3E Company, the leading Global Environmental Compliance Company in the world. With over 7,000 customers, 3E helped companies, throughout the world, manage the ever changing environmental regulations that effected their products and services. 3E utilizes a SaaS based software and complex regulatory database to service its customers. Since 2015, Mr. Christie has been consulting for various Private Equity firms throughout North America assisting them in acquiring companies in the Governance, Risk and Compliance space (GRC) as well as the Supply Chain marketplace. In addition, he has since 2010 served as a Trustee at Rider University. He also serves on the Facility, Business Development and Executive Committees at Rider. Since 2008, Mr. Christie has served as a Director at Alternative Technology, a supplier of distribution systems and technology. Since 2016, he has served on the Board of Directors of Enterknol LLC. Enterknol is a SaaS based compliance solution within the Energy Sector helping various energy companies buy and sell energy competitively. Mr. Christie also served as a Director at Ithos LLC from 2016 through July 2018. Ithos is a the leading regulatory and Supply Chain compliance solution within the Global Cosmetic space providing a complex SaaS based software coupled with regulatory data. While serving as a Director at Ithos, he also served as their Director of Development.

**Defendant Wallitt**

37.     Defendant Steven Wallitt ("Wallitt") has served as a Company director since October 4, 2019. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. According to the 2019 10-K, as of June 3, 2020, Defendant Wallitt beneficially owned 104,733 shares of Company stock, including options and warrants, which represented 1.1% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $5.75, Defendant Wallitt owned approximately $602,214 worth of SCWorx stock.

38.     The 2019 10-K stated the following about Defendant Wallitt:

> Mr. Wallitt, 58, has worked as owner and director of a packaging materials company since 1981. He is responsible for decision making in all areas of the company, including sourcing the best and most efficient methods for achieving maximum profitability and the highest quality standards. He has extensive knowledge in evaluating sales and marketing proposals. Beginning in 2008, he has been an investor in both private and public companies, as well as early-stage public companies with personal investments of $50,000 to more than $3,000,000. He has consulted for many of these companies in areas ranging from public market strategies, growth strategies, evaluating contract proposals, cost control and evaluating employee responsibilities in order to achieve maximum efficiencies. Since 2014, Mr. Wallitt has been an advisory board member to Redtower Capital, a California-based investment firm where he advises on all aspects of client identification, sales and marketing strategies and profit maximization. Since 2017, he has been a significant investor in Alliance MMA and SCWorx. Mr. Wallitt holds a BA degree in communications from Rider College, Lawrenceville, NJ.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of SCWorx, and because of their ability to control the business and corporate affairs of SCWorx, the Individual Defendants owed SCWorx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SCWorx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in

furtherance of the best interests of SCWorx and its shareholders so as to benefit all shareholders equally.

40.     Each director and officer of the Company owes to SCWorx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SCWorx, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of SCWorx were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of SCWorx, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

45.     To discharge their duties, the officers and directors of SCWorx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SCWorx were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to SCWorx's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how SCWorx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of SCWorx and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SCWorx's operations would comply with all applicable laws and SCWorx's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.     Each of the Individual Defendants further owed to SCWorx and the shareholders the duty of loyalty requiring that each favor SCWorx's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SCWorx and were at all times acting within the course and scope of such agency.

48.     Because of their advisory, executive, managerial, and directorial positions with SCWorx, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SCWorx.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of SCWorx was a direct,

necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of SCWorx, and was at all times acting within the course and scope of such agency.

## SCWORX'S CODE OF ETHICS

55.     The Company's Code of Ethics provides that all directors, executive officers, and employees must comply with the Code of Ethics, stating the following:

> SCWorx, Inc. (the "Corporation") has adopted the following Code of Business Conduct and Ethics (this "Code") for directors, executive officers and employees of the Corporation. This Code is intended to focus the directors, executive officers and employees on areas of ethical risk, provide guidance to directors, executive officers and employees to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director, executive officer and employee must comply with the letter and spirit of this Code.

56.     In a section titled, "Maintain Fiduciary Duties," the Code of Ethics states the following:

> Directors and executive officers must be loyal to the Corporation and must act at all times in the best interest of the Corporation and its shareholders and subordinate self-interest to the corporate and shareholder good. Directors and executive officers should never use their position to make a personal profit. Directors and executive officers must perform their duties in good faith, with sound business judgment and with the care of a prudent person.

16

57.     In a section titled, "Corporate Opportunities," the Code of Ethics states the following:

> Directors, executive officers and employees owe a duty to the Corporation to advance its legitimate interests when the opportunity to do so arises. Directors, executive officers and employees are prohibited from: (a) taking for themselves personally opportunities that are discovered through the use of corporate property, information or the director's or executive officer's position; (b) using the Corporation's property, information, or position for personal gain, or (c) competing with the Corporation, directly or indirectly, for business opportunities, provided, however, if the Corporation's disinterested directors determine that the Corporation will not pursue an opportunity that relates to the Corporation's business, a director, executive officer or employee may do so.

58.     In a section titled, "Protection and Proper Use of Corporation Assets," the Code of Ethics states the following:

> Directors, executive officers and employees must protect the Corporation's assets and ensure their efficient use. Theft, loss, misuse, carelessness and waste of assets have a direct impact on the Corporation's profitability. Directors, executive officers and employees must not use Corporation time, employees, supplies, equipment, tools, buildings or other assets for personal benefit without prior authorization from the Chairman of the Audit Committee or as part of a compensation or expense reimbursement program available to all directors or executive officers.

59.     In a section titled, "Fair Dealing," the Code of Ethics states the following:

> Directors, executive officers and employees shall deal fairly and directors and executive officers shall oversee fair dealing by employees and officers with the Corporation's directors, officers, employees, customers, suppliers and competitors. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practices.

60.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Ethics states the following:

> Directors and executive officers shall comply, and oversee compliance by employees, officers and other directors, with all laws, rules and regulations applicable to the Corporation, including insider-trading laws. Transactions in Corporation securities are to be governed by any Corporation policy relating to insider trading that may be in place.

61.     In a section titled, "Accuracy of Records," the Code of Ethics states the following:

The integrity, reliability and accuracy in all material respects of the Corporation's books, records and financial statements is fundamental to the Corporation's continued and future business success. No director, executive officer or employee may cause the Corporation to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, executive officer, or employee may create any false or artificial documentation or book entry for any transaction entered into by the Corporation. Similarly, executive officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Corporation's books and records.

62.     In a section titled, "Quality of Public Disclosures," the Code of Ethics states the following:

The Corporation is committed to providing its shareholders with United States. It is the Corporation's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Corporation, include fair, timely and understandable disclosure. Executive officers and employees who are responsible for these filings and disclosures, including the Corporation's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Corporation's senior management is primarily responsible for monitoring the Corporation's public disclosure.

63.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

64.     Based in New York City, SCWorx is a small cap software company that provides data analytics, information technology solutions, and related services to healthcare providers. The Company's software purportedly simplifies and optimizes information flow within healthcare facilities such as hospitals, and offers benefits including improved supply chain management, accelerated patient billing, and enhanced visibility into various costs and expenses associated with running a healthcare business.

65.     The company now known as SCWorx was originally founded in 2015 under the name "Alliance MMA, Inc.," and operated as a sports media company focused on regional mixed martial arts promotion. In February 2019, the Company acquired SCWorx Corp., then a separate, smaller entity that operated in the healthcare data services market, as the Company does today. In connection with the acquisition, the Company changed its name to SCWorx and adopted the former SCWorx's business model.

66.     Since early 2020, the world has been engulfed in the COVID-19 pandemic. According to the Center for Systems Science and Engineering at Johns Hopkins University, as of August 20, 2020, over 22 million cases of COVID-19 have been reported across the globe, which have resulted in an estimated 789,222 deaths.[4]

67.     The U.S. has been particularly hard-hit by the COVID-19 pandemic, and has reported over 5.5 million cases, and over 173,514 deaths as of August 2020.[5] The pandemic has placed an enormous amount of strain on the nation's healthcare providers, and has caused

---

[4] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd4029942346 7b48e9ecf6 (last visited August 20, 2020).
[5] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd4029942346 7b48e9ecf6 (last visited August 20, 2020).

significant shortages of vital medical supplies, including personal protective equipment such as masks and gloves, as well as antibody test kits capable of testing individuals for the virus.

68.     During the Relevant Period, the Individual Defendants capitalized on this ongoing crisis by representing to the public that the Company had accepted a purchase order from Rethink My Healthcare for a total of 48 million COVID-19 Rapid Testing Units, which would be delivered to hospitals and other healthcare providers in the U.S. These testing units would be supplied by ProMedical, and were purportedly capable of testing individuals for the virus and returning a positive or negative result within minutes.

69.     However, as the Hindenburg Report would later reveal, a myriad of red flags surrounding SCWorx, Rethink My Healthcare, and ProMedical, including histories of fraud and other misconduct as well as such entities lacking the capacity to field an order of this magnitude, indicated that the Purchase Order and the Individual Defendants' representations regarding the Purchase Order were "completely bogus."

**<u>False and Misleading Statements</u>**

***April 13, 2020 Press Release***

70.     On April 13, 2020, the Company issued a press release announcing that the Company had received a purchase order from Rethink My Healthcare for two million COVID-19 Rapid Testing Units. The press release stated the following, in relevant part:

> SCWorx Corp. (Nasdaq: WORX) announced today that it has received a committed purchase order from Rethink My Healthcare, a U.S.-based virtual healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week.

> Under the Order, SCWorx will supply Rethink My Healthcare with IgM/IgG Rapid Detection Kits. SCWorx anticipates receiving the first 2 million rapid detection kits within approximately two weeks.

71.     The press release also quoted Defendant Schessel as follows:

"Widespread testing for COVID-19 disease in the United States is absolutely critical for saving lives and reopening our economy," said Marc Schessel, CEO of SCWorx. "Our substantial purchase order from Rethink My Healthcare will significantly increase the availability of rapid-test kits in the United States. Additional purchase orders currently under negotiation with certain other parties could further increase the U.S. supply of these important tests in the near term."

72.     Upon the release of this news, the price of the Company's stock skyrocketed from $2.25 per share at the close of trading on April 9, 2020, the prior trading day, to $12.02 per share at the close of trading on April 13, 2020, an increase of over $9.77, and on astonishingly high trading volume of over 96 million shares.

### April 14, 2020 Utopia Capital Research Report

73.     On April 14, 2020, Utopia Capital Research published a report on its website calling out the Individual Defendants' "ludicrous claims" regarding the Purchase Order, and pointing out prior occasions on which the Company's management had mislead investors. The report stated the following, in relevant part:

Yesterday, SCWorx Corp.'s share price enjoyed a remarkable parabolic run, increasing by more than five-fold. Volume was also remarkable, exceeding 90 million shares traded, which is ridiculous when one bears in mind that the number of outstanding shares does not even reach 8 million. ***Given this highly unusual market activity we decided to take a closer look at WORX and unsurprisingly we found enough red flags to warrant putting out a short report. These red flags include: atrocious financials, dilution, a so-called "dubious" past as an MMA (mixed martial arts) promotion that settled a securities violations class action lawsuit, a reverse merger involving thousands of cheap shares, press releases making hard to believe claims, terrible financials and ongoing dilution***.

\* \* \*

In January 2018, Alliance MMA was named as a defendant in a class action lawsuit in which the plaintiffs claimed that Alliance MMA, Paul K. Danner (CEO at the time) and John Price (current CFO) misled investors during its 2016 IPO by omitting crucial information relating to stock-based compensation.

\* \* \*

Furthermore, one of the company directors, Charles K. Miller has been a member of Intercloud Systems Inc.'s (ICLD) board of directors since November 2012 []. In

February 2015, Intercloud Systems Inc. was named as a defendant in a class action lawsuit claiming that it had "engaged in a fraudulent scheme to artificially inflate the company's stock price by disseminating false and misleading analyst reports into the market". Intercloud Systems Inc. ended up settling the matter for the sum of $2.7 million.

It thus appears that members of management are no strangers to being involved/linked to securities laws violations class action lawsuits for misleading investors. This should be of great concern when bearing in mind the outlandish claims made by the company over the last few weeks.

\* \* \*

WORX's price run yesterday coincided with news that the company had received a "committed purchase order" from Rethink My Healthcare, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week []. ***This claim is very difficult to believe in light of the fact that the number of COVID-19 test carried out in the USA amount to only 298,499 since January 21, 2020 []. How will Rethink My Healthcare sell all these tests is a very good question, especially as it is a company that specialises in virtual healthcare services with a somewhat underwhelming website*** []. Yet this is not the only grandiose claim recently made by WORX's management. On March 27, 2020, the company claimed that its subsidiary sourced one million surgical masks for "existing large hospital customer", the hospital's name is not specified. [] And on March 30, 2020, it announced that it had signed a new renewable annual data management contract with one of the Northeast's leading Cancer Institutes, once again the name of the customer is not specified.

\* \* \*

WORX is not a good investment. The combination of: ludicrous claims made by management; a CFO named as a defendant in a class action lawsuit that the company settled; terrible financials; a merger involving thousands of shares purchased at a fraction of the current trading price; drastic share price and trading volume increases in a single day; and ongoing dilution, should be enough to make most people highly sceptical about purchasing this company's shares. Stay away from WORX unless you are an experienced trader.

(Emphasis added.)

74.     On this news, the price of the Company's stock dropped by roughly 30%, falling from $12.02 per share at the close of trading on April 13, 2020, to $8.45 per share at the close of trading on April 14, 2020.

***April 15, 2020 Conference Call***

22

75.     On April 15, 2020, the Company held a conference call to discuss updates to the

Company's business strategy relating to COVID-19. During the call, Defendant Schessel discussed

the Company's Purchase Order, stating the following:

> But I also mentioned testing. ***On Monday of this week, we announced receipt of a committed purchase order from Rethink My Healthcare, a U.S.-based telemedicine healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35 million per week***. Under the terms of the purchase order, we will supply Rethink My Healthcare with Point of Care IgM/IgG Rapid Detection Kits that provide immunoglobulin qualitative detection of IGM and IGG antibodies that are specifically generated by the body in response to the SARS COVI-2 infection - a kit targeting the specific antigens on the surface of the virus and providing a simple yes or no result within several minutes. Prior to this purchase commitment, I had been contacted by a multitude of hospitals, government agencies such as FEMA and folks representing the Federal prisons. With such an incredible demand I asked the hospitals in my buying group – hospitals like Partners Healthcare in Boston and the University of Vermont (who by the way have been deputized to purchase supplies for the entire state of Vermont) to assist me in testing these new point of care test kits among other products, quickly passing the kits to their labs and rapidly responding as to their effectiveness – this allowed me a streamlined product approval platform unheard of in normal operating conditions**. *I spent weeks researching over 30 product different lines, distributors, intermediaries until I found an actual manufacturer that had a kit that appeared to me at least to have all the attributes I was looking for*** – which were a very high sensitivity rating to blood samples, had the proper FDA authorizations under the emergency authorization act, was not a Chinese or South Korean manufacturer, was well on its way towards getting full FDA clearance and had enough capacity on his line where I could purchase 25% of his capacity with options to grow that over time. ***We anticipate receiving the first 2 million rapid detection kits in about two weeks and thereafter 2 million tests per week*** – with the full understanding from Rethink My Healthcare, that due to the incredible demand for these kits, until such a time where we can get more capacity, we would be splitting up its contract so that critically effected areas – such as the Federal Prisons could access these important items, albeit not in the quantity they require – however enough so that they can commence a program focused at first on the inmates and employees that need them the most – agreements that we are currently working through terms and procedurals.

(Emphasis added.)

*April 16, 2020 Form 8-K*

76.     On April 16, 2020, the Company filed a current report on Form 8-K with the SEC

further detailing the previously disclosed Purchase Order, and announcing that the Company had

entered into a supply agreement with ProMedical in connection with the Purchase Order. The Form

8-K was signed by Defendant Schessel, and stated the following, in relevant part:

> Effective April 10, 2020, SCWorx, Corp., a Delaware corporation (the
> "Company"), accepted a purchase order ("Purchase Order") from Rethink My
> Healthcare ("RMH"), a U.S.-based virtual healthcare network, under which RMH
> has ordered and the Company is required to deliver two million COVID-19 Rapid
> Testing Units, at a per unit price of $17.50, with provision for additional weekly
> orders of 2 million units for 23 weeks (a total of 48 million units).
>
> On April 10, 2020, concurrently with its acceptance of the Purchase Order, the
> Company entered into a Supply Agreement ("Supply Agreement") with
> ProMedical Equipment Pty Ltd. ("Supplier") pursuant to which the Company
> agreed to purchase and the Supplier agreed to supply an aggregate of 52 million
> COVID-19 Rapid Testing Units over a six month period, comprised of 2 million
> units per week, at a per unit price of $13.00, commencing April 24, 2020. Pursuant
> to the Supply Agreement, the Company is required to pay 50% down at the time of
> order placement, with the remaining 50% due upon completion of order and prior
> to shipping.

77.     The statements referenced in ¶¶ 70–71 and 75–76 herein were materially false and

misleading and failed to disclose material facts necessary to make the statements made not false

and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the

Company's buyer, Rethink My Healthcare, was a relatively tiny company that would almost

certainly be unable to pay for or handle the hundreds of millions of dollars in testing kit orders

provided for in the Purchase Order; (2) the Company's supplier, ProMedical, had a history rife

with fraudulent misrepresentations, and would likewise almost certainly be unable to meet its

obligations pursuant to the Purchase Order; (3) due to the foregoing, the provisions of the Purchase

Order were either grossly overblown or the Purchase Order itself was completely falsified; and (4)

the Company failed to maintain internal controls. As a result of the foregoing, SCWorx's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

78.     On April 17, 2020, Hindenburg Research published the Hindenburg Report, which analyzed in detail the Individual Defendants' representations regarding the Purchase Order. The Hindenburg report discussed some of the dubious circumstances surrounding the Purchase Order as follows:

> On April 13th, SCWorx (NASDAQ:WORX), a nanocap company that lists its headquarters at a Regus Rental Office on the 21st Floor of 590 Madison Ave.,[] took the market by storm.
>
> That day, the company announced the first installment of an order for up to 48 million COVID-19 tests from an Australian manufacturer. Per the announcement, the deal represented $35 million in orders per week, for a potential total deal size of $840 million.
>
> ***It was undoubtedly a monumental announcement for a company with a market cap of just $16 million at the time. The sheer size of the previously unannounced order had the potential to single-handedly alter the course of the ongoing national fight against the novel coronavirus.***
>
> The company's stock skyrocketed on the announcement. The day before the announcement, shares of the relatively sleepy company had closed at $2.25 per share and had traded a total of just 21,400 shares.
>
> On the day of the announcement, shares closed at $12.02, an increase of 434%, on 96,182,900 shares of volume, making it one of the most actively traded names on the NASDAQ.
>
> The original announcement stated that the company would be receiving a go-forward provision for up to 2 million units per week. A subsequent 8-K filed yesterday provided additional detail, stating that the company would be paying a unit price of $13 per test, and would be required to pay 50% down and 50% due on completion of each order (amounting to an up-front payment of $13 million for the first week of units).
>
> This sum may have come as a surprise to investors – it certainly did to us – given that as of its latest financials, the company only reported tangible assets of $2.6 million [] and a history of consistent net losses. []

> *Beyond the seeming inability to actually fund such a massive deal, SCWorx's business (up until the COVID-19 pandemic, apparently) was in developing healthcare management software, not medical products themselves.*

(Emphasis added.)

79.    The Hindenburg Report also seriously called into question the credibility of

Defendant Schessel, and pointed out numerous red flags surrounding Rethink My Healthcare and

ProMedical, stating the following:

> *Other surprises that may lie in store for investors are the numerous red flags we found that lead us to believe this announcement is completely bogus.* Namely, our findings that:
>
> - SCWorx's CEO was convicted of felony tax evasion and sued over allegations of fraudulently submitting expense reports in the past.
> - The company SCWorx is claiming to buy the tests from, Promedical, was recently denounced by a legitimate Covid-19 test manufacturer as "fraudulently misrepresenting" themselves as sellers of their product.
> - Promedical's CEO is a convicted rapist and has been accused in a media exposé of defrauding investors at his previous business.
> - The purported purchaser of tests that SCWorx has lined up is a virtual health company that was started less than 2 years ago by a 25-year-old recent college graduate. Given that the purchaser is a virtual health company, and the tests must be administered in real life, the fit seems less than ideal.
>
> \* \* \*
>
> Marc Schessel serves as both CEO and interim CFO of SCWorx. (The company's earlier CFO was terminated in October and was paid cash and shares as part of a settlement agreement.)
>
> *Schessel has a checkered history. A lawsuit by a former employer detailed how Schessel pled guilty to felony tax evasion in 2003.* That conviction was described as having been the result of failing to pay income taxes on illicit proceeds from a bribery scheme that led to the indictment of two other individuals.
>
> *Previously, another former employer sued Schessel for submitting fraudulent expense reports, which resulted in a judgement against him.*
>
> \* \* \*
>
> The supplier for SCWorx has a mysterious history when it comes to coronavirus testing kits in the U.S. and Australia.

\* \* \*

In late March, Promedical's name appeared multiple lists showing current COVID-19 diagnostic devices listed with the FDA []. In each instance it claimed to be offering tests made by Wondfo, a large, well-known biotech company.

**But, as of 4/16/2020, it is not listed on the FDA's list of test providers permitted under an Emergency Use Authorization nor permitted by its more general standards.**

\* \* \*

A similar phenomenon seems to have also taken place in Promedical's native Australia. In a March 23 article on MILNZ.co.nz that listed COVID-19 diagnostic tests for legal supply in Australia, Wondfo's test is again listed under "Name of Test" with Promedical as the "Australian Sponsor".

\* \* \*

But again – just like in the U.S. – when we check the updated list on the official Australia Department of Health website, *we find that Promedical has mysteriously disappeared and that Wondfo's name now appears next to two totally different Australian sponsors*[.]

(Emphasis added.)

80.     The Hindenburg Report discussed the purported relationship between ProMedical and Wondfo as follows:

**Wondfo seemingly solved the mystery of Promedical disappearing off the U.S. and Australian FDA sites when it publicly disavowed Promedical as misusing its name, via an official press release**.

On April 5, 2020, Wondfo issued an official statement distancing themselves from Promedical:

**"We hereby clarify that now Promedical Equipment Pty Ltd is NOT an authorized representative nor distributor of in Australia, America, and any other countries/districts. We recommend purchasing products only from authorized distributors or dealers, which will increase the likelihood that you will receive authentic products.  is not responsible for any product complaints arising from products purchased from Promedical Equipment Pty Ltd."**

\* \* \*

27

We called Wondfo on April 15, 2020 to try and understand what relationship it had with Promedical in the past, if any. We asked if the company used to have a relationship with Promedical and we were told by a Wondfo representative:

**"As far as I know we never had any deal in place with Promedical Equipment," we were told.**

We asked the person to double check, so they put us on hold for two minutes. When they came back, they confirmed:

*"We've never had any kind of relationship with them at all. Ever."*

**We reached out to SCWorx to discuss this and other issues but the representative repeatedly insisted that he could not provide any information beyond the company press releases.**

(Emphasis added.)

81.     The Hindenburg Report also documented Hindenburg Research's investigation into Rethink My Healthcare, stating the following:

We also looked into the customer that would purportedly be buying tests from SCWorx, a company called Rethink My Healthcare.

Rethink My Healthcare was founded in August 2018 by Connor Gallic, a then 25-year-old who didn't have health insurance and wanted to start his own company to solve the problem of low-cost mental healthcare.

\* \* \*

We could find little information on the company except some articles around its founding. Connor is listed as President of the company and "Chief Healthcare Hero" on his LinkedIn page. We found only 2 employees on LinkedIn, consisting of Connor and his Chief Revenue Officer.

\* \* \*

**While there are no publicly available financials for ReThink, we find it difficult to believe that the relatively unknown company – founded less than 2 years ago and offering $60 per month virtual doctors visits – is going to be able to come up with upwards of the $35 million per week it has committed to purchasing from SCWorx.**

Further, we can't figure out what the synergies are between a *virtual* healthcare company offering a test that needs to be *physically* administered to people. ReThink's website also notes that you must be a medical or law enforcement

professional to purchase a test, narrowing the funnel of those who can place orders from the company.

(Emphasis added.)

82.     The Hindenburg Report summarized its allegations as follows:

- SCWorx, a nanocap company headquartered in a Regus rental office in New York City, recently announced it had entered into massive $35 million per week deal to buy and re-sell Covid-19 tests, causing its stock to surge 434%.
- ***SCWorx's CEO has a checkered past, including pleading guilty to felony tax evasion charges and paying a judgement in a lawsuit alleging he submitted fraudulent expense reports.***
- ***The Covid-19 test supplier that SCWorx is buying from, Promedical, also is laden with red flags. Its CEO is a convicted rapist and formerly ran another business accused of defrauding its investors and customers. The CEO was also alleged to have falsified his medical credentials.***
- Promedical claimed to the FDA and regulators in Australia to be offering COVID-19 test kits manufactured by large, well-respected Chinese firm Wondfo.
- ***Wondfo put out a press release days ago stating that Promedical "fraudulently mispresented themselves" as sellers of its Covid-19 tests and disavowed any relationship. We spoke with Wondfo and confirmed there was never any relationship.***
- Meanwhile, the buyer that SCWorx has lined up for up to $840 million dollars in tests is a virtual healthcare company started by a 25-year-old in August 2018 that looks modestly sized, with only 3 employees and 3 consultants/advisors listed on its team page– ***hardly the major partner that we believe would be capable of handling hundreds of millions of dollars in orders.***
- *Obviously*, ***we believe the Covid-19 hype surrounding SCWorx is completely bogus*** and we predict shares will soon return to the $2.25 price level they were at prior to the hype.
- ***We also think shares risk being halted and ultimately could move far lower than $2.25 if/when regulators investigate the company's potentially nefarious business practices at a time when our country and its citizens are arguably at their most vulnerable. We're offended by how egregious this appears, not only as investors, but as Americans***.

(Emphasis added.)

83.     On this news, the price of the Company's stock plunged over the course of the next

three trading days on heavy volume, falling from $6.96 per share at the close of trading on April

16, 2020, to $5.76 per share at the close of trading on April 21, 2020, representing a loss in value of over 17%.

84.     Sure enough, on April 21, 2020, the SEC issued an order suspending all trading of SCWorx stock, effective April 22, 2020. The order stated that the suspension was implemented due to "a lack of current and accurate information concerning the securities of SCWorx," and that "the public interest and the protection of investors require a suspension of trading in the securities of [SCWorx]."

85.     On April 30, 2020, another of Hindenburg Research's claims was vindicated, when the Company filed a current report on Form 8-K with the SEC revealing that due in part to "substantial concerns" regarding ProMedical, Rethink My Healthcare and the Company had terminated their respective arrangements with ProMedical relating to the Purchase Order. The Company also revealed that effective April 23, 2020, Defendant Christie had resigned from the Company's Board. The Form 8-K stated the following, in relevant part:

> As previously reported, on April 10, 2020, the Company (i) accepted a purchase order ("ProMedical Purchase Order") from Rethink My Healthcare ("RMH"), a U.S.-based virtual healthcare network, for two million ProMedical COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, and (ii) entered into a supply Agreement ("ProMedical Supply Agreement") with ProMedical Equipment Pty Ltd. ("ProMedical") pursuant to which the Company agreed to purchase and ProMedical agreed to supply an aggregate of 52 million COVID-19 Rapid Testing Units over a six month period.

> ***Subsequent to entering into the ProMedical Supply Agreement, substantial concerns have arisen related to ProMedical's ability to fulfill its obligations under the Supply Agreement.*** Under the ProMedical Supply Agreement, ProMedical was required to secure the requisite FDA approvals to permit the sale of its test kits in the US which was a condition of the Company's obligation to purchase the test kits. ***RMH has since terminated the ProMedical Purchase Order. Based on the foregoing, the Company terminated the ProMedical Supply Agreement on April 29, 2020*** and has lined up an alternate supplier, as described below.

> On April 29, 2020, the company entered into a new Supply Agreement ("Supply Agreement") with Feltwell Holding SA ("Feltwell") pursuant to which the Company agreed to purchase and Feltwell agreed to supply an aggregate of 500,000 COVID-19 IGG/IGM Rapid Testing Units(GCCOV-20A), manufactured by Syntron Bioresearch, Inc. (or equivalent product) ("Covid 19 Test Kits").

(Emphasis added.)

86.      Shortly thereafter, on May 5, 2020, the Company filed another current report on Form 8-K with the SEC revealing that on April 29, 2020, the employment of the Company's Chief Operating Officer, non-party James Schweikert, had been "terminated by mutual agreement."

87.      The next day, on May 6, 2020, the Company posted an update on the trading halt on its website. The update revealed that on May 5, 2020, the Company had received a request for information and documents from NASDAQ, and that the trading halt would remain in place until the request was satisfied, stating the following:

> SCWorx Corp. (Nasdaq: WORX) announced today that on May 5, 2020, The Nasdaq Stock Market  requested certain additional information and documents from the Company.  In connection with this information request, the Nasdaq Stock Market informed the Company that it has initiated a "T12 trading halt," which means the halt will remain in place until the Company has fully satisfied Nasdaq's request for additional information. The Company intends to respond to Nasdaq's May 5 request  as soon as possible, but not later than May 13, 2020.
>
> As previously reported, on April 22, 2020, the Securities and Exchange Commission ordered that trading in the securities of the Company be suspended because of "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace" (the "SEC Trading Halt").   The SEC Trading Halt expired yesterday, May 5, 2020, at 11:59 PM EDT, and has not been reinstated as of this date.

88.      On June 12, 2020, the Company filed the 2019 10-K, which disclosed that the Company was being investigated by the U.S. Attorney's Office for the District of New Jersey, stating the following:

> [I]n April 2020, the Company was contacted by the U.S. Attorney's Office for the District of New Jersey, which is seeking information and documents from the Company's officers and directors relating primarily to the April 13, 2020 press

release concerning COVID-19 rapid test kits. The Company is fully cooperating
with the U.S. Attorney's Office in its investigation.

89.    The NASDAQ-imposed trading halt on the Company's stock was ultimately lifted

on August 10, 2020. Since then, the price of the Company's stock has continued to dwindle—as

of August 20, 2020, the stock trades as low as $1.70 per share.

## DAMAGES TO SCWORX

90.    As a direct and proximate result of the Individual Defendants' conduct, SCWorx

will lose and expend many millions of dollars.

91.    Such expenditures include, but are not limited to, legal fees associated with the

Securities Class Actions filed against the Company and its CEO, any internal investigations, and

amounts paid to outside lawyers, accountants, and investigators in connection thereto.

92.    Such expenditures also include any costs associated with NASDAQ's information

and documents request and any investigation in connection thereto, as well as any costs associated

with the U.S. Attorney's Office for the District of New Jersey's investigation of the Company.

93.    These expenditures further include, but are not limited to, compensation and

benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

94.    As a direct and proximate result of the Individual Defendants' conduct, SCWorx

has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust

enrichment.

## DERIVATIVE ALLEGATIONS

95.    Plaintiff brings this action derivatively and for the benefit of SCWorx to redress

injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of SCWorx, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting thereof.

96.     SCWorx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff is, and has been since the beginning of the Relevant Period, a shareholder of SCWorx. Plaintiff will adequately and fairly represent the interests of SCWorx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

99.     A pre-suit demand on the Board of SCWorx is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Schessel, Miller, and Wallitt (the "Director-Defendants") along with non-parties Mark Shefts and Timothy A. Hannibal (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

100.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

101.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

102.    Additional reasons that demand on Defendant Schessel is futile follow. Defendant Schessel is the Company's founder, and has served as the Company's Chairman and CEO since 2012. Thus, as the Company admits, he is a non-independent director. Defendant Schessel was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Schessel is a defendant in the Securities Class Actions. For these reasons, Defendant Schessel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since October 24, 2018. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any,

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104.    Additional reasons that demand on Defendant Wallitt is futile follow. Defendant Wallitt has served as a Company director since October 4, 2019. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wallitt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105.    Additional reasons that demand on the Board is futile follow.

106.    Defendants Miller and Wallitt served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, members of the Audit Committee are responsible for overseeing, among other things, the Board's fulfillment of its responsibilities relating to the Company's reporting practices, the quality and integrity of the Company's financial reports, and the Company's compliance with legal and regulatory requirements. Defendants Miller and Wallitt failed to ensure the integrity of the Company's public reports and the Company's compliance with legal and regulatory requirements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading

statements with the SEC. Thus, Defendants Miller and Wallitt breached their fiduciary duties, are not disinterested, and demand is excused as to them.

107.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

108.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Ethics, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

109.    SCWorx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for SCWorx any part of the damages SCWorx suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

110.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

111.    The acts complained of herein constitute violations of fiduciary duties owed by SCWorx's officers and directors, and these acts are incapable of ratification.

112.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of SCWorx. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of SCWorx, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

113.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause SCWorx to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

114.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

115.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of SCWorx's business and affairs.

117.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

118.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SCWorx.

119.    In breach of their fiduciary duties owed to SCWorx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's buyer, Rethink My Healthcare, was a relatively tiny company that would almost certainly be unable to pay for or handle the hundreds of millions of dollars in testing kit orders provided for in the Purchase Order; (2) the Company's supplier, ProMedical, had a history rife with fraudulent misrepresentations, and would likewise almost certainly be unable to meet its obligations pursuant to the Purchase Order; (3) due to the foregoing, the provisions of the Purchase Order were either

grossly overblown or the Purchase Order itself was completely falsified; and (4) the Company failed to maintain internal controls. As a result of the foregoing, SCWorx's public statements were materially false and misleading at all relevant times.

120. The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

121. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of SCWorx's securities.

122. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of SCWorx's securities.

123. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SCWorx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125. Plaintiff on behalf of SCWorx has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

126. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SCWorx.

128. The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from SCWorx that was tied to the performance or artificially inflated valuation of SCWorx, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

129. Plaintiff, as a shareholder and a representative of SCWorx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

130. Plaintiff on behalf of SCWorx has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

131.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence SCWorx, for which they are legally responsible.

133.    As a direct and proximate result of the Individual Defendants' abuse of control, SCWorx has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, SCWorx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf of SCWorx has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of SCWorx in a manner consistent with the operations of a publicly-held corporation.

137.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, SCWorx has sustained and will continue to sustain significant damages.

138.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

139.    Plaintiff on behalf of SCWorx has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

140.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

142.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

143.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

144.    Plaintiff on behalf of SCWorx has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendant Schessel for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

145.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146.    SCWorx and Defendant Schessel are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the

Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Schessel's willful and/or reckless violations of his obligations as CEO of SCWorx.

147.    Defendant Schessel, because of his position of control and authority as CEO and Chairman of SCWorx, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of SCWorx, including the wrongful acts complained of herein and in the Securities Class Actions.

148.    Accordingly, Defendant Schessel is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

149.    As such, SCWorx is entitled to receive all appropriate contribution or indemnification from Defendant Schessel.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of SCWorx, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to SCWorx;

(c)    Determining and awarding to SCWorx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing SCWorx and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SCWorx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of SCWorx to nominate at least three candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding SCWorx restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.


Dated: August 21, 2020                    Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                                          <u>/s/Phillip Kim</u>
                                          Phillip Kim
                                          275 Madison Avenue, 40th Floor
                                          New York, New York 10016
                                          Telephone: (212) 686-1060
                                          Facsimile: (212) 202-3827
                                          Email: pkim@rosenlegal.com

                                          *Counsel for Plaintiff*

## **VERIFICATION**

I, Josstyn Richter am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

8/20/2020

_____
Josstyn Richter